# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

ANTHONY R.,[1]

      Plaintiff,

v.                                   ACTION NO. 4:20cv200

KILOLO KIJAKAZI,
Commissioner of Social Security,

      Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Anthony R. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act, respectively.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  He requests remand to require the ALJ to apply the correct version of listing 12.05, and consider certain evidence not specifically addressed in the ALJ's opinion.

      An order of reference assigned this matter to the undersigned.  ECF No. 15.  The ALJ applied the correct version of listing 12.05, and addressed the evidence such that the decision is supported by substantial evidence.  Accordingly, pursuant to the provisions of 28 U.S.C.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

§ 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that Anthony R.'s motion for summary judgment (ECF No. 17) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 19) be **GRANTED**.

## I.      PROCEDURAL BACKGROUND

Anthony R. ("plaintiff") protectively filed applications for DIB and SSI in 2015, alleging he became disabled on July 3, 2015, due to learning disabilities, learning problems, spelling problems, depression, and bipolar disorder. R. 160–61, 173–74, 365, 368, 372.[2]  Following the state agency's denial of his claims, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 160–221, 274–75. ALJ Deborah Foresman heard the matter on December 19, 2017, and issued a decision denying benefits on April 17, 2018. R. 109–59, 227–38. The Appeals Council remanded the decision on June 5, 2019, for the ALJ to give further consideration to plaintiff's residual functional capacity, to obtain evidence from a vocational expert if warranted, and to cure any Appointments Clause defect. R. 244–47.

ALJ Raquel Bailey Smith held a hearing on February 11, 2020, during which plaintiff amended his alleged onset date to April 8, 2016. R. 61, 105–06. ALJ Bailey Smith issued a decision denying benefits on April 1, 2020. R. 12–30. On November 5, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–3. Therefore, ALJ Bailey Smith's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff commenced this action on December 29, 2020. ECF No. 1. The Commissioner answered the complaint on August 2, 2021. ECF No.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

13.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on September 9, 2021, and October 12, 2021, respectively. ECF Nos. 16–20.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Plaintiff*

Plaintiff was 26 years old at the time of his amended alleged onset date of disability of April 8, 2016—a younger individual under SSA rules. *See* R. 65, 106; 20 C.F.R. §§ 404.1563(c), 416.963(c).[3]  Plaintiff graduated high school with an IEP diploma in 2008.  R. 466.

Plaintiff previously worked as a store laborer at Walmart, first as a cart pusher and then unloading trucks and sorting boxes onto pallets.  R. 71–76.  His father next got plaintiff a job as a construction laborer on the same crew on which his father worked laying water and sewer pipes. R. 76–77, 99–100.  Plaintiff quit work as a construction laborer after becoming so dehydrated he had to go to the hospital.  R. 78; *see also* R. 506 ("the heat put me in the hospital twice . . . [t]hey didn't think I was cut out for that type of weather").  He did not work again for two years while he was trying to get back on his feet, but was "just going in circles."  R. 79.  He has his driver's license and had a car when he was working full time.  R. 67, 81–82.

Plaintiff began going to the Community Services Board ("CSB") in March 2016.  R. 91. He began working part time in 2017 for the CSB cleaning buildings and transferring vehicles from one CSB to another for approximately ten hours each week.  R. 70, 79–81.  Plaintiff performed this part time work through the date of his hearing on February 11, 2020.  R. 81.  At the time of his hearing, plaintiff resided with a roommate in an apartment provided by the CSB for individuals

---

[3] For claimants under age 50, SSA "generally do[es] not consider that [their] age will seriously affect [their] ability to adjust to other work."  20 C.F.R. §§ 404.1563(c), 416.963(c).

with mental health issues and had been living there for approximately six months. R. 66, 90. Plaintiff testified that he did not feel capable of full time work because he had not been able to get back on his feet after hitting rock bottom. R. 81–83.

Plaintiff explained that during week days, he spends four hours each day at Charterhouse, a clubhouse for individuals with mental illness where between 50 and 60 people gather. R. 82–83, 85. At Charterhouse, he uses the computer, cleans, cooks, and occasionally works in a snack bar selling snacks under the supervision of the CSB staff. R. 83–85, 92. When not working or going to Charterhouse, plaintiff watches television, listens to music, or socializes with other clubhouse members sometimes at a different clubhouse. R. 85. On weekends, he downloads movies and music onto his laptop at the library. R. 86. He relies on his case manager for transportation as he does not have a car. R. 83, 86. He also takes field trips with Charterhouse, such as staying at a clubhouse in South Carolina for two weeks. R. 94–95.

Plaintiff had taken medication for depression and anxiety for five years and also took medication to sleep. R. 86–88, 97–98. The depression medication helped and his depression symptoms improved during his time treating with the CSB, but he "still ha[d] periods in [his] life where [he] want[ed] to do more." R. 86–87, 98. The anxiety medication controlled his symptoms as long as he was not in a new environment or around big crowds of people. R. 88. The only medication side effect he experienced was an upset stomach if he takes medication before eating. *Id.*

Plaintiff completed four adult function reports between October 2015 and October 2016, either on his own or with help from others. R. 526–36, 538, 560–67, 578–85.

On October 18, 2015, plaintiff's sister completed an adult function report indicating plaintiff lived with his grandmother. R. 526–36. She indicated plaintiff could prepare sandwiches

4

or frozen dinners; do his own laundry and clean with encouragement; perform yard work with instruction; shop for clothes, shoes, and groceries; pay bills with assistance; attend church; and spend time with others every other day. R. 529–32. She indicated, while plaintiff could not pay attention for long, he finishes what he starts, such as conversations, chores, reading, or watching a movie. R. 533. She noted plaintiff was "not so good" at following written or spoken instruction, and needed close supervision and to hear instructions twice. *Id.* He did not handle stress or changes in routine well. R. 534. She related that plaintiff has never been laid off or fired from a job due to problems getting along with others. R. 533.

On December 1, 2015, plaintiff spoke with a disability determination services employee over the phone, and relayed similar information. R. 538. Plaintiff had no issues with personal care, taking out the trash, washing dishes, cleaning the bathrooms, vacuuming daily, doing yard work, preparing frozen dinners, driving alone if he knows where he is going, and managing his finances with occasional help from his grandparents. *Id.* Plaintiff reported he could pay attention for extended periods but has to "really focus" and could not have distractions, could follow verbal instructions if shown how to do something, has no major difficulty following written instructions, and has no problems getting along with others, though he tends to stay to himself. *Id.*

On October 17, 2016, plaintiff completed another adult function report indicating he was living in a group home. R. 560–67. Plaintiff explained that bipolar mood swings kept him from thinking clearly and focusing on one thing at a time, anxiety keeps him from being in large crowds, and "mania" makes it difficult for him to go to sleep. R. 561. He again indicated having no problem with personal care, performing household chores, cooking daily, and shopping weekly. R. 562–63. He indicated an ability to count change, but that money management was hard and he has poor impulse control. R. 563–64. He played cards, socialized, watched television, played

basketball, and attended group meetings daily. R. 564. Despite this, he noted that his impairments caused a decrease in activity, made him less talkative, caused him to isolate, and made it difficult to have strong relationships with family. R. 565. He reported an ability to pay attention for "a couple minutes," and that he needed to go over written and spoken instructions a few times. *Id.* Unlike in his previous adult function reports, plaintiff indicated he had a hard time trusting authority figures, and that he had been fired from Walmart and one other job because of problems getting along with others. R. 566; *see also* R. 382 (work history). He reported a fear of failure and low self-esteem. R. 566. Plaintiff explained that he is unable to work because anxiety gives him panic attacks and makes it difficult to be in small areas, depression makes him feel hopeless and suicidal, and mania makes it difficult to focus and causes him to isolate when he comes down. R. 567.

On October 27, 2016, Devoya Johnson with the CSB completed an adult function report for plaintiff. R. 578–85. She indicated plaintiff was "not able to do anything," "cannot stay focus[ed] on anything," does not sleep well, needs encouragement to shave and take care of personal needs, and needs assistance to take prescribed medication. R. 579–80. She indicated plaintiff could not pass his driving test, manage money, get along with authority figures, or be around people, noting he has never gotten along with people. R. 581–83. She estimated that he could walk five minutes before needing to rest for ten minutes. R. 583. She noted plaintiff cannot handle stress and needs to stick to a routine or he gets confused. R. 584.

**B.    *School Records***

Plaintiff was reevaluated for his special education placement in June 1999, when he was 9-years-old and in the third grade. R. 699–701. He obtained a full scale score of 69 on the Wechsler Intelligence Scale for Children ("WISC") III, with a verbal IQ of 75 and a performance

IQ of 66.  R. 700.

In November 2005, when plaintiff was in the 10th grade and 15-years-old, his school psychologist administered the (WISC-IV).  R. 696–98.  He received a composite full scale IQ score of 67, functioning within the mildly mentally disabled range of intelligence.  R. 696, 698.  His composite score was 69 for verbal comprehension, 73 for perceptual reasoning, 71 for working memory, and 78 for processing speed.[4]  R. 696.  He had "relatively strong visual motor coordination and close-to-average verbal comprehension," with mental math skills within the low average range.  R. 698.[5]

During high school, plaintiff completed carpentry courses at the Northern Neck Vocational Center.  R. 437.  He was evaluated by a Post-Secondary Education/Rehabilitation Transition team that found him to be a consistent worker who demonstrated good work tactics, and listed his strengths as appearance, ability to accept supervision, feedback, safety awareness, care of materials/property, cooperation, and teamwork.  *Id.* (The assessment team noted his carpentry teacher felt plaintiff was a great student behaviorally but needed constant supervision, and was not able to work on a team.)

An IEP team assessment dated May 2, 2008, shortly before his graduation, indicates plaintiff showed a desire and willingness to learn, became overwhelmed and frustrated with new tasks, but could understand step-by-step directions, and would "usually understand the task and continue to completion."  R. 434.  His reading, writing, and math skills were at a 4th-grade level,

---

[4] Plaintiff's "sum of scaled scores" was 14 for verbal comprehension, 17 for perceptual reasoning, 10 for working memory, and 12 for processing speed, resulting in 53 for his full scale.  R. 696.

[5] In January 2006, when he was in the 10th grade and 16-years-old, plaintiff took the Wookcock-McGrew-Werder Mint battery of achievement, achieving a standard score of 75 in reading (4.5 grade level) and 68 in math (4.6 grade level).  R. 671.

and he was spelling at a 5th-grade level. R. 437. His functional skills, described as communication skills, social and behavioral skills, independent living skills, mobility skills, and job training/skills, were at a 3rd-grade level. R. 466.

Plaintiff graduated with an IEP diploma in June 2008. R. 436, 466. Based on interviews of his teachers and observation of plaintiff, school notes reflect plaintiff participated in class discussions, completed all of his assignments, maintained a C average in his courses, got along with and enjoyed people, had a sense of humor, and enjoyed working. *Id.* A summary of plaintiff's functional performance further indicated he was capable of holding a job, finding transportation to and from work, and taking care of his personal needs. *Id.* Recommendations for post-secondary goals included following procedures with DMV to obtain a driver's license, opening a checking and savings account, participating in a relevant work experience, completing training at Woodrow Wilson Rehabilitation Center, and continuing to work with the Department of Rehabilitation Services. *Id.*

**C.   *Medical Records and Assessments Prior to Onset Date – April 8, 2016***

**1.   *Woodrow Wilson Rehabilitation Center Assessments***

In January 2006, when plaintiff was 16-years-old and in the 10th grade, a residential and independent living skills assessment was performed over a period of two weeks while plaintiff lived at the Woodrow Wilson Rehabilitation Center. R. 674–91. It revealed plaintiff did well with self-care, was able to do laundry without assistance, could make change to $10.00 with prompts and assistance, passed his room inspections, oriented fairly easily to the campus with no difficulty finding his way around, was an effective communicator, was friendly with all of his peers, and was polite, respectful, eager to please, and at ease with the staff. R. 674–77, 690.

On his vocational evaluation, plaintiff obtained a positive recommendation for on-the-job training in the welding field, food services, and some areas of carpentry and woodworking, demonstrating good hand speed, good interpersonal skills, and good physical strength. R. 685, 689; *see also* R. 765–87 (ancillary reports and assessments that support the summary). He was friendly, polite, respectful, social, persistent, and a good, steady worker with the ability to accept, comprehend, stay on task, and meet productivity expectations with his assignments. R. 685, 687. Repeated directions and general supervision enhanced his work quality and quantity, and he showed improvement with practice. *Id.* Plaintiff "earned positive ratings in the categories of work energy, stamina, work tolerance, persistence, work pace, concentration, initiative and dependability." R. 768.

In July 2007, when plaintiff was 17-years-old and had completed the 11th grade, he participated in a two-week situational assessment program to determine if food service was a feasible option for a vocational goal. R. 787–805. Plaintiff adjusted well to the residential dormitory setting, "demonstrated more maturity than any of his peers," demonstrated good self-advocacy skills, was enthusiastic, worked well with staff and peers, and demonstrated strengths in all areas assessed. R. 795–96. His performance skills and abilities included: visual skills, communication skills, strength and endurance, attention to detail, following one or two step verbal instructions, following one or two step written instructions, retaining newly learned information, detecting errors, correcting errors, problem solving skills and judgment, improved performance with practice, and accuracy in performance. *Id.*

After graduation from high school, from September 2008 through March 2009, plaintiff returned to the Woodrow Wilson Rehabilitation Center to participate in an assessment in food service as well as a driving evaluation. R. 804–20. Plaintiff successfully completed the kitchen

assistant program, maintaining focus, diligently completing his training tasks, and taking initiative to ensure his tasks were completed timely. R. 806. Plaintiff completed internships in food service with Bittersweet Bakery and Mary Baldwin College, receiving excellent reports with both willing to serve as references. R. 807, 809, 814. Mary Baldwin College indicated it "would love to hire him if he lived" nearby. R. 809, 878. His attitude was positive, he did not complain, he did "far beyond average on following instructions," and he was "very anxious to work full time." R. 807, 876.

Plaintiff also participated in a drivers' education class earning his learner's permit, but required further practice driving in a familiar area as he had difficulty with "'unknowns' that occur on the highway." R. 806.

### 2. *Tappahannock Primary and Urgent Care*

On June 8, 2015, plaintiff received treatment at Tappahannock Primary for dehydration after performing construction work for the day. R. 894–98. He was not given IV fluids, but was told to return if his symptoms worsened. R. 896. Plaintiff returned on June 24, 2015, and was treated for mild heat exhaustion. R. 901–07. Plaintiff indicated that he had muscle cramps beginning two weeks prior, and a headache the previous day. R. 904. He was scheduled to work construction, but "called out" due to body aches. R. 904–05. Plaintiff was treated with IV fluids and discharged home. R. 905–06.

On January 12, 2016, plaintiff was seen by Thomas Cleary, M.D., at Tappahannock Urgent Care due to feeling anxious and depressed after he tried to return to work and felt like people were staring at him. R. 912–15. His grandmother reported a history of mood problems and depression for which he had never been placed on medication. R. 912. Plaintiff reported drinking and using cannabis occasionally, and going from happy to sad several times a day. *Id.* Dr. Cleary assessed

plaintiff with mood disorder due to known physiological condition with depressive features and depression. R. 913. He prescribed Zoloft and referred plaintiff to counseling. R. 913–14.

### 3. *Middle Peninsula Northern Neck CSB*

On March 7, 2016, mental health therapist Patsy Hemp completed an initial intake for plaintiff at Middle Peninsula Northern Neck CSB. R. 966–72. Plaintiff reported symptoms of depression since 2013, and participation in anger management counseling. R. 966. Plaintiff reported struggling with depressive symptoms for the previous two years since he lost several jobs he enjoyed not due to any of his actions. *Id.* He lost his job working as a cook at Wendy's due to a grease fire in the kitchen that caused him to be out of work for three weeks, followed by an inability to get enough hours to make it pay for him to travel to the job. *Id.* He also worked as a pipe layer where he was able to save money, but his mother was taking advantage of his income to pay her bills. *Id.* His mother kicked him out of the house, and the disappointment at this spilled over into his not being able to continue at his job. *Id.* Mixed messages from his family left plaintiff with low self-esteem, lack of motivation, and an increased consideration of self-harm. R. 966–67. His family did not take plaintiff to the hospital when he became agitated, but instead called the police resulting in several misdemeanor charges and court ordered anger management. R. 967.

Plaintiff denied suicidal ideation at the time of his intake, but endorsed symptoms of depression, including: difficulty sleeping; varied appetite; reduced memory and motivation; and spiraling thoughts. *Id.* He exhibited no symptoms of anxiety except constantly sweating hands. *Id.* He did not respond positively to Zoloft. R. 967, 1000.

Plaintiff reported he did not feel emotionally supported by his family. R. 968. Plaintiff cared for his own needs (personal care, washing clothes, cooking, shopping, saving money, cleaning the house, etc.) but had not lived independently since he became an adult. *Id.* Ms. Hemp

noted that plaintiff was motivated, had a positive work history, and a good work ethic, and referred him for mental health outpatient services, psychiatric services, and case management.  R. 968–70.

**D.**   ***Medical Records and Assessments Following Alleged Onset Date – April 8, 2016***

**1.**   ***Tappahannock Primary and Urgent Care***

On April 11, 2016, Allen Tsui, M.D., with Tappahannock Primary Care treated plaintiff for depression.  R. 954–61.  Plaintiff reported that he lacked motivation, avoided people, was occasionally sad, and occasionally thought of taking pills or slitting his wrists. R. 954–55. Plaintiff had been given a trial of Zoloft in the emergency room, but had run out of the prescription approximately three weeks prior.  R. 954.  Plaintiff was "thinking about disability because of some learning problems as well as depression."  R. 955.  Dr. Tsui diagnosed mild single current episode of major depressive disorder and increased plaintiff's dose of Zoloft from 50 mg to 100 mg daily. R. 955–56.

Plaintiff returned on May 23, 2016, and explained to Dr. Tsui that he was hospitalized with suicidal ideation earlier in the month and he thought "the 100 mg [Zoloft prescription] and weed may have something to do with it."  R. 1074.  He was "doing well" with his Zoloft prescription back to 50 mg without side effects, although he was still experiencing sadness.  *Id.*  Dr. Tsui noted plaintiff's mood and judgment were normal and diagnosed moderate single current episode of major depressive disorder.  *Id.*

When plaintiff returned for a prescription refill on August 22, 2016, he reported to Dr. Tsui that his mood was good with minimal complaints of sadness.  R. 1083.  Dr. Tsui noted plaintiff's normal mood and normal judgment, and continued plaintiff on Zoloft.  R. 1084.

### 2.    *Hospitalization at VCU Medical Center*

On May 11, 2016, while living with his grandmother, plaintiff had an altercation with his cousin resulting in plaintiff choking the cousin until the cousin poked plaintiff in the eye.  R. 980, 1055–56.  The police were called, and plaintiff was charged with assault and possession of marijuana.  R. 980, 1055–56, 1130.  Later that day, plaintiff was taken to VCU Medical Center due to suicidal ideation.  R. 939–48, 980.  Plaintiff reported feeling suicidal off and on over the weekend prior to this incident.  R. 1012.  He reported poor sleep since his Zoloft was increased to 100 mg, poor appetite, poor mood, decreased energy, and trouble with concentration.  *Id.*

His grandmother reported that plaintiff was not allowed back in her house, had been smoking a great deal of marijuana and isolating in his room, and was fired from his last two jobs for smoking marijuana on the job.  R. 1033, 1056.  While at the medical center, plaintiff slept six hours each night, ate 100% of his meals, was pleasant and cooperative, was social with his peers without any behavioral problems, and denied suicidal thoughts.  R. 1032–33.  Plaintiff was discharged on May 13, 2016, with a Zoloft prescription reduced to 50 mg daily and instructions to meet with his CSB case manager.  R. 941, 946, 1013.

### 3.    *Middle Peninsula Northern Neck CSB*

#### a.    **Crisis Stabilization Team**

Following his discharge from the hospital and a short stay with his aunt and uncle, plaintiff resided at Discovery Place ("DPI"), transitional housing offered through the Middle Peninsula Northern Neck CSB for individuals impacted by mental health and/or substance abuse.  R. 973, 975, 980, 1317.

During his initial screening on May 16, 2016, plaintiff was within normal limits for most areas assessed, but had slowed speech at times, difficulty expressing his feelings, and presented as

depressed. R. 982. Daily progress notes from plaintiff's crisis stabilization team dated May 17 through 26, 2016, indicate plaintiff was polite, calm, pleasant, eating well, interacting well with all residents, helping with chores, attending AA meetings, and complying with his medication regimen. R. 1143–44, 1153, 1161. He expressed a wish to return to work when he had his health straightened out, and applied for co-op work with the CSB. R. 1143, 1161. On May 17, he did not show any symptoms of depression or anxiety. R. 1143. On May 19, staff observed that he could not sit still for long and he "presented as manic" at times, having difficulty sticking to one task, but presented no symptoms of depression. R. 1146, 1148. On May 20, plaintiff reported that he found Zoloft was somewhat helpful as he was not as depressed, though he continued to have racing thoughts and mood swings. R. 1149. On May 21, staff noted that plaintiff was focused but quiet at times. R. 1150.

> **b.   CSB Psychiatric Treatment—Dr. Tyler, NP McKay, Dr. Sheth**

On May 26, 2016, Michael Tyler, M.D., performed a psychiatric evaluation during which plaintiff reported mood swings since his teen years and episodes of mania alternating with depressive episodes. R. 1001. Plaintiff denied current suicidal ideation and reported his sleep was fair and he was getting along well with others at DPI. *Id.* Plaintiff's mental status examination revealed he was within normal limits in all areas noted, including: appearance, behavior, attention and concentration, speech, mood, range of affect, thought content, thought process and association, and perception. *Id.*; *see also* R. 974 (plaintiff was within normal limits on all areas observed in a mental status evaluation by a residential counselor conducted June 1, 2016). He was prescribed a trial of Trileptal, and was asked to return to the clinic in six weeks. R. 1001.

In a psychiatric follow-up with Dr. Tyler in July 2016, plaintiff was again within normal limits on all areas assessed in his mental status examination. R. 1002. He reported he was "doing

very well," feeling better, less moody, decreased racing thoughts, good sleep, and no medication side effects, though he had occasional anxiety when bothered by others. R. 1002, 1119. Dr. Tyler continued plaintiff on Trileptal and Zoloft and started a trial of Vistaril. R. 1002.

In December 2016, nurse practitioner Victoria McKay noted plaintiff reported he was "doing very well." R. 1194. In March 2017, she noted plaintiff was having difficulty sleeping, but was otherwise "doing very well" on his medications. R. 1196. He was working cleaning for the CSB and attending AA meetings consistently. R. 1196–97. NP McKay added a prescription of Trazodone to assist with sleep. R. 1197. NP McKay noted in June 2017 that plaintiff's sleep was much better with Trazodone. R. 1199. Plaintiff indicated he still had some mood swings and irritability, but these were better with Trileptal. *Id.* Plaintiff reported to NP McKay in July and October 2017 that his mood swings and irritability had resolved, and he was getting good sleep. R. 1202, 1205; *see* R. 1202 (plaintiff reports that his 2016 hospital stay was due to a suicide attempt when he cut his wrist). Plaintiff's mental status examination showed he was within normal limits on all areas assessed with the exception of an anxious mood in October 2017. R. 1202–03, 1205–06.

On September 4, 2019, Parthiv Sheth, M.D., conducted an annual examination at plaintiff's CSB apartment. R. 1325. Plaintiff reported "doing much better," getting along well with his housemates, and experiencing no major side effects from medications. *Id.* His mental status examination revealed plaintiff was oriented with an appropriate affect, goal-directed thought process, and fair insight and judgment, but an anxious mood. *Id.* Dr. Sheth continued plaintiff on his current medications. *Id.*

Dr. Sheth evaluated plaintiff in October, November, and December 2019, noting plaintiff was overall very pleasant, getting along well with peers, volunteering at Charterhouse, planning

and taking a trip to South Carolina with Charterhouse, sleeping, eating, and tolerating medication well, with no fear, paranoia, or sense of hopelessness.  R. 1330, 1337–38.  His mental status examinations were normal on each occasion.  *Id.*  Due to concerns that the medication may be leading to weight gain, plaintiff's Trileptal dosage was lowered.  R. 1338.

### c.   CSB Mental Health Services—LCSW Patsy Hemp

During his intake interview for resident counseling on June 1, 2016, plaintiff admitted that he self-medicated with marijuana for depression daily, and his desire to use resulted in the inability to complete daily tasks.  R. 973, 981.  Plaintiff reported using marijuana to help stabilize his mood off and on since age 19.  R. 1174.  Plaintiff presented as depressed, with slowed speech at times, difficulty expressing his feelings, and recent suicidal ideation.  R. 982.  He had good insight into his situation, but poor judgment when dealing with his anger.  *Id.*

Following plaintiff's intake, Ms. Hemp held monthly individual therapy sessions with plaintiff from May 2016 through September 2016.  R. 1174–75.  She noted plaintiff had a bright affect and positive mood, enjoyed living at DPI, had adjusted to other residents and the routine, and had begun cooking for others in the group home.  *Id.*; *see also* R. 1097 (noting plaintiff was planning meals for the group home residents and looking into updating his servSafe certification).  She noted that a peer made him anxious, but the anxiety resolved when the peer moved out and plaintiff was started on Vistaril.  R. 1174.  Plaintiff participated in a two-phase program to address his abuse of marijuana and alcohol and was volunteering up to 20 hours each week.  *Id.*

Following a short stay with his aunt and uncle in December 2016 when plaintiff had difficulty getting along with his family, plaintiff moved into a CSB "sober apartment" in January 2017.  R. 1209–10, 1249–51.

Ms. Hemp's progress notes from December 2016 through February 2017 indicate plaintiff

worked cleaning CSB locations 2 to 3 days each week. R. 1251. Due to the variable schedule, his supervisor would call and remind plaintiff of where he needed to be and how to catch transportation. *Id.* Ms. Hemp noted plaintiff had difficulty organizing, remembering, and keeping appointments, although he readily followed directions once someone else determined the plan. *Id.*

Ms. Hemp's progress notes from March through September 2017 indicate plaintiff was better organized, used his phone and a daily schedule program to stay on track, and did "real well when he has a full schedule." R. 1252; *see also* R. 1216–30 (after obtaining an extension of time to do so, plaintiff successfully completed his community service hours and reported the potential of working at Goodwill when the hours were completed). He was able to get groceries and food from the food bank through help from his narcotics anonymous sponsor and Bay Transit. R. 1253. Plaintiff was "extremely motivated," had increased his work hours, put in applications at a job fair, executed plans for a fishing trip, finished probation, and received his one-year chip from narcotics anonymous/alcoholics anonymous. R. 1253–54; *see also* R. 1239–48, 1254 (plaintiff attempted to enroll in a welding class at the community college, but encountered difficulty following through on paperwork).

On September 19, 2017, Ms. Hemp conducted a mental health evaluation of plaintiff finding he was within normal limits on all areas assessed with the exception of impaired recent memory and below average intellectual and functional capacity. R. 1186–87. Plaintiff remained alcohol and drug free over the past year. R. 1186. After plaintiff began taking medication, his symptoms of major depressive disorder abated and he experienced increased energy, motivation, and drive. R. 1186–87. He required the use of reminders and tools to keep appointments due to poor concentration, memory, and organization. R. 1187. He was working part-time as a custodial driver for the CSB co-op and was a friendly, dependable worker who followed directions. *Id.*

17

In April and July 2018, Sheree Dameron, a qualified mental health professional, noted plaintiff reported he had been "maintaining pretty good." R. 1258–63. She encouraged plaintiff to attend appointments, linked him to resources to assist with going to school and finding a job, and encouraged him to follow up on two online job applications he submitted. *Id.*

In August 2018, Ms. Hemp noted plaintiff "does well in completing repetitive tasks such as cleaning [and] cooking when in a supportive environment," has a good work ethic, and is motivated to work, but "is not able to work competitively at this time." R. 1267, 1269. A mental status examination revealed a depressed mood, impaired recent memory, and below average intellectual functioning, with the remaining 13 areas assessed falling within normal limits. R. 1270–71.

### d.    CSB Mental Health Services—Kelli Jones, LPC

In September 2018, Kelli Jones, a licensed professional counselor, noted plaintiff was living with his father. R. 1275. LPC Jones indicated plaintiff isolates, worries, has racing thoughts, starts tasks that he does not complete, and gets very down. R. 1273. While plaintiff reported "things have gotten better," LPC Jones noted plaintiff still struggled with concentration. *Id.* With the exception of difficulty getting to sleep, his mental status exam was within normal limits with average intellectual functioning. R. 1276–77.

In plaintiff's quarterly review for October 2018 through January 2019, LPC Jones noted that plaintiff went to Charterhouse four to five times each week where he was participating in the maintenance work unit putting supplies in bathrooms, emptying trash, sweeping, and mopping floors. R. 1286. He was also participating in field trips, park picnics, card games, and exercise classes. R. 1286–87.

From January through April 2019, plaintiff attended workshops on gaining independence,

discussed wanting employment, coordinated his own transportation, managed his medications, and engaged in helping to run the Charterhouse snack bar providing customer services, counting money, and being responsible for inventory. R. 1305–06. Plaintiff reported eating more healthy foods and his medications were "doing pretty good" with no side effects, but he had no success with finding a job. R. 1292; *see also* R. 1262 (plaintiff put in two job applications).

In April through July 2019, plaintiff expressed major concerns about becoming homeless due to his father planning to move out of the area. R. 1311. Staff brainstormed housing options and employment options, which were impacted by lack of transportation. *Id.* Plaintiff missed some of his scheduled appointments due to transportation issues. R. 1314. Plaintiff was encouraged to look for jobs on the Internet and in the newspapers, to apply, and to follow up. R. 1316. Despite this, plaintiff was within normal limits on all areas assessed in his mental status examination conducted on May 14, 2019 by Sheree Dameron, QMHP. R. 1298. Plaintiff was engaged with good eye contact, responded well to questions, and indicated he was eating less and healthier in an attempt to lose weight. *Id.*

On August 29, 2019, Amanda Campagnola noted plaintiff was transitioning to more independent living in a CSB home with three roommates as he did not want to move out of the state with his father. R. 1317, 1324. She noted plaintiff has periods of depression, anxiety, and irritability and was not taking his medications as prescribed. R. 1317. She indicated plaintiff had limited coping skills and low self-esteem. *Id.* Plaintiff presented with some anxiety and a blunt affect, which she attributed, in part, to his transition in living arrangements. R. 1322. He reported his sleep was good, he rarely needed his medication to sleep, and his appetite varies. *Id.*

From July through October 2019, plaintiff was participating almost daily in clubhouse activities, expressed an interest in upcoming clubhouse international training, and continued to

attend workshops with prompting and encouragement.  R. 1331–32.  Plaintiff took an active role in assigning and delegating food and fitness tasks during the morning meetings, but his participation in the tasks was inconsistent.  R. 1331.  Plaintiff was encouraged to attend workshops to build independent living skills, and to locate affordable housing.  R. 1334.  He was going to the store as needed, as well as the foodbank, and completed a CSB co-op work application.  R. 1339, 1341.

### 4.    *Consultative Examination on April 2, 2016, by Dr. Buncher*

On April 2, 2016, approximately one month prior to plaintiff's hospitalization at VCU, Robert Buncher, Ph.D., performed a consultative examination.  R. 929–34.  Dr. Buncher reviewed plaintiff's family history, educational history, work history, social history, and current medications.  R. 929–30.  Dr. Buncher performed a mental status evaluation and administered the WAIS-IV.  R. 931–32.

Plaintiff described his family as basically supportive, but indicated he has difficulty being around his mother who is controlling and critical.  R. 929.  When plaintiff was 13, he witnessed his 9-year-old sister suffer a fatal heart attack leaving him "very saddened" as they were close.  R. 929, 931.  Dr. Buncher reviewed plaintiff's school records, considering his participation in an IEP program, vocational technical school, and standardized testing.  R. 929–31.

Plaintiff recounted his work history, including work as a construction laborer and work for Walmart.  R. 930.  Plaintiff indicated that, while working at Walmart, he was often mixed up, needed to be shown how to perform tasks, and was ultimately let go for being unable to move at the required pace.  *Id.*  Plaintiff further indicated that he worked at BJs for three to six months as a stocker, but his hours were cut to 20 hours per week during the Christmas rush without reason.  *Id.*  Plaintiff quit because he was not making enough money.  *Id.*  He next worked at Target,

unloading trucks then working the floor as a stocker, but had a conflict with a peer. *Id.* He was simultaneously working at Wendy's where he struggled to maintain the appropriate pace and needed frequent reinstruction. *Id.* Plaintiff left his lower paying job at Target because he was making too much income to remain in his low-income apartment. *Id.*

Plaintiff reported that his friends had been negative influences, so he stayed to himself interacting with family and same-age cousins. *Id.* He reported occasionally drinking alcohol, but no longer using marijuana. *Id.* Plaintiff took Zoloft for a period, during which time his grandmother observed that he was calmer. R. 930–31.

With respect to plaintiff's mental status, Dr. Buncher observed that he was appropriately dressed, had a euthymic mood, and interacted in a "pleasant and chatty fashion." R. 931. His speech flowed normally, though his rate was mildly rapid. *Id.* He was well-oriented, and had good immediate recall, good delayed recall, and good judgment. *Id.* Plaintiff had difficulty answering questions, such as replying in the negative when asked if he had other jobs and later describing three additional jobs. *Id.* His attention and concentration were poor "as he was unable to spell the word 'world' backward, and became very erratic in his calculations of serial 3's beginning at 100, after becoming stuck and lost in his calculations." *Id.* He has days when he is sad for several hours, becoming withdrawn and isolating, which he manages by listening to music, writing in a book, or playing video games. *Id.* He "endorsed suicidal ideation," and made a nonlethal attempt when he was 13-years-old after losing his sister. *Id.*

Dr. Buncher administered the WAIS-IV, on which plaintiff obtained a full scale IQ score of 72, suggesting domains in the low-average and borderline ranges. R. 931–32. Plaintiff scored 70 on verbal comprehension, 81 on perceptual reasoning, 74 on working memory, and 84 on processing speed. R. 932.

Dr. Buncher diagnosed plaintiff with attention deficit hyperactivity disorder as he evidences problems maintaining attention and focus, a difficulty he had throughout his school years, and he moves and talks in a mildly rapid manner. R. 933. Dr. Buncher ruled out bipolar disorder as plaintiff "evidences no frank manic episodes," and his depressed moods appear in the dysthymic range. *Id.*

Dr. Buncher found plaintiff competent to manage his funds in a very basic way as he is able to cash checks, perform bank transactions, and pay his phone bill on time. *Id.* Dr. Buncher concluded that plaintiff performs best in simple and repetitive tasks and is unable to learn more complex tasks, is able to maintain regular attendance in the workplace as he has done on several jobs for extended periods of time, and accepts instruction from supervisors. *Id.* He further concluded plaintiff "will have significant difficulty dealing with the stresses encountered in competitive work as a result of problems learning tasks and requiring reinstruction, problems maintaining focus, and problems secondary to this slow pace of performing tasks." *Id.*

### 5. *Medical Source Statement from Patsy Hemp, LCSW, on January 4, 2017*

On January 4, 2017, Ms. Hemp completed a medical source statement form indicating plaintiff suffered from major depression (recurrent, moderate) and post-traumatic stress disorder ("PTSD") and noted that his prognosis was "guarded." R. 1181. Ms. Hemp opined that plaintiff's level of impairment was marked with respect to his ability to: (1) get along with the general public and supervisors; (2) perform at a consistent pace; (3) respond to changes in routine; and (4) deal with normal work stress. R. 1181–82. She opined he was moderately limited in his ability to make simple decisions, maintain concentration and focus, and get along with colleagues, and mildly limited in his ability to carry out short, simple instructions. *Id.* She estimated the plaintiff would need to take unscheduled breaks for at least 15 minutes three times per week, and would be absent

once or twice a month due to his mental illness. R. 1182. She found plaintiff to be compliant with his treatment to the best of his ability and that he was not a malingerer. R. 1181.

### 6.   *Medical Source Statement from Parthiv Sheth, M.D., dated January 29, 2020*

On January 29, 2020, Dr. Sheth completed a medical source statement form diagnosing plaintiff with major depressive disorder (recurrent, moderate), PTSD, and cannabis dependence (in remission). R. 1352. Dr. Sheth opined that plaintiff had a marked limitation in carrying out short, simple instructions; performing at a consistent pace; and, responding to changes in routine. *Id.* He had a moderate limitation in maintaining concentration and focus and dealing with normal work stress, a mild limitation in getting along with co-workers and supervisors, and no limitation in getting along with the general public. *Id.*

### 7.   *State Agency Physician Reviews*

Upon initial consideration on April 12, 2016, David Deaver, Ph.D., reviewed the record relating to plaintiff's mental impairments and found plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of extended decompensation. R. 164–65. Dr. Deaver found plaintiff's impairments were borderline intellectual functioning, attention deficit and hyperactivity disorder, and affective disorders. R. 165.

According to Dr. Deaver, plaintiff was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral

extremes; and, respond appropriately to changes in the work setting.  R. 167–69.  Plaintiff was not

significantly limited in the remaining 12 areas assessed.  *Id.*  Dr. Deaver concluded plaintiff was

best suited to work involving two to three step tasks and simple forms, involving limited periods

of sustained concentration or attention with few distractions, involving limited interaction with the

public and with large groups of coworkers, and in a low stress work environment.  R. 168–69.

Upon reconsideration on November 16, 2016, Leslie E. Montgomery, Ph.D., agreed with

Dr. Deaver in most respects, essentially mirroring Dr. Deaver's conclusions with respect to the

work best suited to plaintiff.  R. 200–01.

### E.    *Hearing Testimony of Vocational Expert*

Lori Cowan, a vocational expert ("VE"), testified at the hearing before the ALJ.  R. 61,

98–104.  According to VE Cowan, plaintiff had past relevant work as a store laborer—an unskilled,

medium-exertion level position, and as a construction worker—an unskilled, very heavy exertion

level (performed at a medium exertion level) position.  R. 99–100.  In her first hypothetical, ALJ

Bailey Smith asked VE Cowan if work would be available for a person with plaintiff's education

and experience and ability to work at all exertional levels if that person were able to:   (1)

understand, remember, apply, and carry out simple, routine and repetitive tasks consistent with

unskilled, repetitive tasks; (2) concentrate, persist, and maintain pace to complete unskilled,

repetitive tasks that do not require production rate pace, meaning fast pace; (3) respond

appropriately to supervisors and coworkers to complete unskilled, repetitive tasks; (4) have not

more than occasional, brief interaction with the public; and, (5) adapt to occasional changes

associated with unskilled, repetitive work.  R. 100.  VE Cowan opined that such a person would

be capable of performing plaintiff's past work as a construction laborer.  R. 100–01.  VE Cowan

opined that unskilled, medium exertional work as a kitchen helper/dishwasher and hand launderer

would also be available for such a person. R. 101. In response to a second hypothetical, VE Cowan testified that work as a construction laborer, kitchen helper, and hand launderer would remain available to the same hypothetical individual if he were further limited such that he would occasionally be off-task 10 percent of the day. R. 101–02. In response to a third hypothetical, VE Cowan testified that no work would be available for that individual if he were off-task 15 percent of the day and would miss work, leave early, or arrive late two days per month. *Id.*

In response to counsel's question, VE Cowan testified that no work would be available for the individual described in the first two hypotheticals if he required additional supervision once or twice per two-hour increment, to encourage him, correct mistakes, or remind him of the task. R. 102–03.

VE Cowan clarified that her testimony regarding public contact, off-task behavior, absenteeism, and a supportive versus competitive employment, were based on her experience rather than the *Dictionary of Occupational Titles*. R. 104.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[6] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition

---

[6] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his residual functional capacity; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 15–30.

The ALJ found that plaintiff met the insured requirements[7] of the Social Security Act through December 31, 2019, and had not engaged in substantial gainful activity since April 8, 2016, his alleged onset date of disability. R. 15.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) borderline intellectual functioning; (b) attention deficit hyperactivity disorder, and affective disorder ("ADHD"). *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 15–18.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with several nonexertional limitations that he: (a) is able to understand, remember, apply, and carry out simple routine and repetitive instructions consistent with unskilled repetitive tasks; (b) is able to concentrate, persist, and maintain pace to complete unskilled repetitive tasks that do not require production rate pace, meaning fast pace; (c) is able to respond appropriately to supervisors and coworkers to complete unskilled repetitive tasks; (d) may have no more than occasional interaction with the public; and (e) is able to adapt to occasional changes associated with unskilled repetitive work. R. 18–28.

---

[7] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

Based upon this RFC, the ALJ found at step four that plaintiff could resume working as a construction laborer. R. 28. In addition, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs, such as a kitchen helper, hand launderer, and housekeeper, which existed in significant numbers in the national economy. R. 28–30.

Accordingly, the ALJ concluded plaintiff was not disabled from April 8, 2016, through the date of the decision. R. 30.

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

27

[Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.  *Id.*

## V.   **ANALYSIS**

Plaintiff makes two challenges to the ALJ's findings at step three of the five-step analysis.  First, plaintiff argues the ALJ committed reversible legal error by applying the wrong legal standard in her listing 12.05 analysis.  Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 18, at 6–8.  Second, plaintiff argues the ALJ erred by failing to acknowledge and weigh certain relevant medical evidence in her analysis at step three.  *Id.* at 9–10.

Defendant responds that the ALJ correctly applied the current version of listing 12.05 in effect at the time of the decision, properly addressed the record evidence, and that substantial evidence supports the ALJ's decision.  Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 20, at 20–29.

### A.   *The ALJ applied the correct legal standard in her listing 12.05 analysis at step three.*

Plaintiff argues that, because his disability claims were filed prior to January 17, 2017, the ALJ was required to use the less stringent standard for listing 12.05 in effect prior to the regulatory changes made effective January 17, 2017.  Pl.'s Mem. 6–7.  Plaintiff asserts that a reasonable person reviewing the record could come to the conclusion that he meets all three criteria of the less stringent standard and remand is necessary to apply the correct standard.  *Id.* at 8.

Defendant notes that the SSA regulations indicate the new version of listing 12.05, once effective, would apply "to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." Def.'s Mem. 20 (citing 81 Fed. Reg. 66138, 2016 WL 5341732 (effective Jan. 17, 2017)). The SSA further indicated it would "use these final rules on and after their effective date, in any case in which we make a determination or decision," and ask federal courts to "review [the] final decisions using the rules that were in effect at the time [the SSA] issued the decision." 2016 WL 5341732, at *66138, n.1.

Plaintiff applied for benefits in 2015. R. 368, 372. ALJ Foresman denied benefits on April 17, 2018, after the regulatory changes to listing 12.05 were in effect. R. 227–38. The Appeals Council remanded the decision on June 5, 2019. R. 244–47. ALJ Bailey Smith applied the new listing and denied plaintiff benefits on April 1, 2020, which is the decision plaintiff is challenging. R. 30. ALJ Bailey Smith properly applied the version of listing 12.05 that was in effect at the time of her decision. *See Kiser v. Saul*, 821 F. App'x 211, 213 n.1 (4th Cir. 2020) (noting "the version of the listings in effect as of the date of the Commissioner's final decision controls"); *see also Rudolph v. Comm'r, Soc. Sec. Admin.*, 709 F. App'x 930, 932 (11th Cir. 2017) (applying the listing "as it read on the date of the ALJ's decision"); *Larkin v. Berryhill*, No. 6:17-1166-MGL-KFM, 2018 WL 4560575, at *5 (D.S.C. May 30, 2018) (same). Accordingly, plaintiff's motion for remand to apply the correct legal standard with respect to listing 12.05 should be **DENIED**.

**B.**   ***Remand is not necessary to require the ALJ to weigh IQ scores and assessments that plaintiff intellectually functions on a 3rd to 4th grade level in her step three analysis.***

Plaintiff asserts that, during the step three analysis, the ALJ failed to acknowledge, address, or weigh three valid full-scale IQ scores of 66, 67, and 69, and an IEP team assessment completed shortly before plaintiff graduated from high school indicating that he intellectually functions on a 3rd to 4th grade level. Pl.'s Mem. 9–10. Plaintiff argues "not only did the ALJ apply the wrong

legal standard at Step Three, she overlooked and failed to weigh highly probative and relevant medical evidence in the process." *Id.* at 10.

Defendant asserts the ALJ had no obligation to discuss every piece of evidence, especially IQ scores dating back to 1999 well before the alleged onset date. Def.'s Mem. 27–28 (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)). Defendant further noted that the ALJ stated she "carefully read and considered all the evidence of record, regardless of whether it is specifically cited in the decision," and acknowledged that plaintiff had "listing level IQ scores," ultimately concluding plaintiff did not have the deficits in adaptive functioning necessary to meet the listing. *Id.* at 27.

For the reasons that follow, the Court finds substantial evidence supports the ALJ's finding that plaintiff does not meet the listing requirements for deficits in adaptive functioning and, therefore, remand is not required for the ALJ to specifically weigh IQ scores and portions of an IEP team assessment.

### 1.    Criteria for listing 12.05 – intellectual disability

The listing of impairments describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing impairments, organized by major body systems). If a claimant's impairments meet or medically equal a listing, that alone suffices to establish disability at step three, without need for further analysis. 20 C.F.R. §§ 404.1520(d), 416.920(d). An impairment meets a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.* at §§ 404.1525(c)(3), 416.925(c)(3). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990).  A claimant bears the burden of establishing impairments meeting or equaling the criteria of a listing.  *See Zebley*, 493 U.S. at 530–31; *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (noting the claimant bears the burden of proof and production at steps one through four).

At the third step of the sequential analysis, ALJ Bailey Smith addressed several listings pertaining to plaintiff's mental impairments, listings 12.04 (depressive, bipolar and related disorders), 12.05 (intellectual disorder), and 12.11 (neurodevelopmental disorders).  R. 15–18; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Plaintiff requests a remand asserting the ALJ erred by failing to consider "three valid Full-Scale IQ scores of 66, 67, and 69" and "evidence that [plaintiff] intellectually functions on a 3rd to 4th grade level," arguments that pertain to the ALJ's finding that plaintiff did not meet the criteria of listing 12.05B[8] for intellectual disorder.  Pl.'s Mem. 9–10.

To meet the criteria for listing 12.05B, plaintiff must show:

(1) Significantly subaverage general intellectual functioning evidenced by (a) or (b):

(a) A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

(b) A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

(2) Significant deficits in adaptive functioning currently manifested by extreme

---

[8] Plaintiff has not argued that the ALJ erred in finding plaintiff fails to meet the criteria for listing 12.05A.  R. 17–18.  To meet this listing, plaintiff must show he has "[s]ignificantly subaverage general intellectual functioning evident in [his] cognitive inability to function at a level required to participate in standardized testing of intellectual functioning."  *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.05A(1).  Plaintiff sat for several standardized IQ tests, including one given by the consultative examiner during the SSA review process.  R. 696–701, 931–32.  The test scores from some of these tests form the basis for plaintiff's argument for remand.  Accordingly, the ALJ's finding that plaintiff does not meet the criteria for listing 12.05A is supported by substantial evidence.  R. 18.

limitation of one, or marked limitation of two, of the following areas of mental functioning:

(a) Understand, remember, or apply information; or
(b) Interact with others; or

(c) Concentrate, persist, or maintain pace; or

(d) Adapt or manage oneself; and

(3) The evidence about [the claimant's] current intellectual and adaptive functioning and about the history of [his] disorder demonstrates or supports the conclusion that the disorder began prior to [his] attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05B.

> **2.    Substantial evidence supports the ALJ's finding that plaintiff does not have the requisite deficits in adaptive functioning necessary to meet listing 12.05B(2).**

The Court will first address ALJ Bailey Smith's finding that plaintiff does not meet the criteria outlined in 12.05B(2) for deficits in adaptive functioning.[9]   The ALJ found plaintiff had moderate limitations—on a 5-point scale of none, mild, moderate, marked, and extreme—in each of the four areas of mental functioning outlined in listing 12.05B(2), which indicates his capacity to perform the activities is impaired.  R. 15–18; *see* 20 C.F.R. §§ 404.1520a(c), 416.920a(c); SSA Program Operations Manual System ("POMS") DI 24510.063(B)(2).  Therefore, plaintiff did not meet listing 12.05B(2), which requires extreme limitations in one or marked limitations in two areas of mental functioning.

The ALJ first found plaintiff has a moderate limitation in understanding, remembering, or applying information.  R. 16.   An individual's ability to understand, remember, or apply information "refers to the abilities to learn, recall, and use information to perform work activities."

---

[9] Listings 12.04 and 12.11, contain these same "paragraph B" criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.04(B), 12.11(B).

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(1).[10]  The ALJ referenced treatment records indicating plaintiff's memory is generally within normal limits. R. 16 (citing R. 1193–1205). The ALJ considered plaintiff's graduation from high school with an IEP, passing his exam for his learner's permit, obtaining a driver's license, cashing checks, performing bank transactions, and paying his phone bill on time. *Id.* (citing R. 466–68, 563, 933). The ALJ referenced plaintiff's school records indicating he had an ability to understand step-by-step directions, understand tasks, continue tasks to completion, and spell, read, write, and perform basic calculations with some difficulty. *Id.* (citing R. 466–67). Lastly, the ALJ considered plaintiff's daily activities including going to Charterhouse for four hours each weekday where he works on computers, types information, helps workers with their transportation by inputting route information, cleans, cooks, and sells snacks at the snack bar, as well as going to the library on weekends to download movies and music on his laptop. *Id.* (citing R. 79–95).

Next, the ALJ found plaintiff has a moderate limitation in interacting with others. *Id.* An individual's ability to interact with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2).[11] The ALJ considered plaintiff's reports of conflict with a peer on a past job, isolating himself, and

---

[10] "Examples include:  Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(1).

[11] "Examples include:  cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2).

having trouble getting along with others. *Id.* (citing R. 930). The ALJ further considered an October 2016 function report where plaintiff reported leaving the house regularly, shopping in stores, participating in group counseling, as well as playing cards, socializing, playing basketball, and playing board games on a daily basis. *Id.* (citing R. 577–85). The ALJ discussed plaintiff's hearing testimony that he lives in a CSB housing unit with a roommate, goes to Charterhouse every weekday along with 50 to 60 other people, hangs out with peers at another clubhouse with approximately 15 people, and goes on field trips including attending a picnic, going to the mall, and taking a two-week trip to South Carolina. *Id.* (citing R. 79–95).

The ALJ found plaintiff had moderate limitations in concentrating, persisting, or maintaining pace. R. 16. An individual's ability to concentrate, persist, or maintain pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).[12] The ALJ referenced treatment records indicating plaintiff's attention, concentration, thought process, and associations are within normal limits. R. 16 (citing R. 1193–1205). The ALJ further relied on plaintiff's obtaining a learner's permit and driver's license, activities at Charterhouse, use of the library, travel by walking and driving, bank transactions, and payment of bills. R. 16 (citing R. 79–95, 933).

Lastly, the ALJ found plaintiff had moderate limitations in adapting or managing himself. R. 17. An individual's ability to adapt and manage himself "refers to the abilities to regulate

---

[12] "Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).

emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(4).[13] The ALJ indicated that, since his alleged onset date, plaintiff refrained from cannabis abuse, socialized with friends, worked part time, and participated in group counseling and outpatient therapy. R. 17. He adjusted to living in a substance abuse apartment, living with his father, and ultimately sharing a housing unit with roommates. *Id.* He leaves the house regularly and shops in stores. *Id.* He engages in many activities at Charterhouse as well as visiting peers at another clubhouse and using the library. *Id.* The ALJ concluded plaintiff does not have at least two marked limitations or one extreme limitation in any of these areas of mental functioning and does not meet the criteria for listing 12.05B(2). R. 17–18.

The ALJ thoroughly reviewed plaintiff's mental health treatment and impairments, and any corresponding impacts upon his functioning and adaptation. R. 15–28. The ALJ weighed school records, treatments notes, notes kept by plaintiff's case manager and others at the CSB, as well as plaintiff's own representations and those of his family made in his function reports and testimony. *Id.* As discussed above, the evidence shows plaintiff can perform self-care, perform household chores, drive a car, perform part-time work with supervision at the CSB, socialize with peers, shop, use the library, use a computer, and perform community service. He shares an apartment with three roommates, shares a room with one roommate, and performed full-time work in the past. Further, during the relevant time period, plaintiff was within normal limits on almost all areas assessed in his mental status examinations. Substantial evidence in the record supports the ALJ's finding that plaintiff does not have "deficits in adaptive functioning currently manifested by

---

[13] "Examples include:   Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(4).

extreme limitation of one, or marked limitation of two, . . . areas of mental functioning" as required by the listing. R. 18.

### 3. Remand to require the ALJ to weigh plaintiff's IQ scores and intellectual functioning upon graduation from high school is not necessary or productive where plaintiff fails to meet the requisite deficits in adaptive functioning.

Plaintiff argues the ALJ committed reversible legal error by failing to specifically address IQ scores and an IEP team assessment indicating plaintiff intellectually functioned on a 3rd to 4th grade level upon graduation from high school. Pl's Mem. 9.

Plaintiff participated in standardized testing in 1999 when he was 9-years-old and in the 3rd grade. R. 699–701. His full scale IQ score on the WISC-III was 69 with a verbal IQ of 75 and a performance IQ of 66. R. 700. Plaintiff participated in standardized testing again in 2005 when he was 15-years-old and in the 10th grade obtaining a full scale IQ score of 67 on the WISC-IV. R. 696. His composite score was 69 for verbal comprehension, 73 for perceptual reasoning, 71 for working memory, and 78 for processing speed. *Id.*[14] Dr. Buncher administered the WAIS-IV to plaintiff during his consultative examination in 2016 when plaintiff was 26-years-old. R. 929, 931–32. Plaintiff's full scale IQ score was 72 with a score of 70 for verbal comprehension, 81 for perceptual reasoning, 74 for working memory, and 84 for processing speed. R. 932.

Plaintiff is correct that the ALJ did not specifically address the IQ scores plaintiff received in 1999 and 2005. The ALJ did address the IQ score plaintiff received during his consultative

---

[14]Plaintiff references three full scale IQ scores of 66, 67, and 69. Pl's. Mem. 4, 8–9 (citing R. 404, 696, 700, 702, 805). The Court's review of the record does not reveal a full scale IQ score of 66. In summarizing plaintiff's June 1999 WISC testing that resulted in a full scale IQ score of 69 with a verbal IQ of 75 and a performance IQ of 66, the Woodrow Wilson Rehabilitation Center indicated plaintiff scored "Full Scale 69, Verbal 75, Full Scale 66." R. 805. This appears to be a typographical error, as plaintiff's performance IQ score was 66. R. 700. This may account for plaintiff's reference to three IQ tests scores of 66, 67, and 69. Pl's. Mem. 4, 8–9.

examination by Dr. Buncher in 2016. R. 18. In doing so, the ALJ stated that plaintiff did not meet the requirements of 12.05B(1) because plaintiff's full scale IQ score was 72 and none of his subtests were below 70. *Id.* This statement is not accurate as the listing requires "[a] full scale . . . IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70," and plaintiff scored a 70 on verbal comprehension. R. 932; 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05B(1)(b). Later in the opinion, however, the ALJ concedes that plaintiff "has listing level IQ scores, but he does not have the requisite deficits in adaptive functioning." R. 25. As she references plural "IQ scores," the ALJ is potentially referring to earlier IQ scores in addition to the one received in 2016. This later finding by the ALJ—that plaintiff has listing level IQ scores and meets the criteria in listing 12.05B(1)—is accurate. To the extent the ALJ erred by initially stating plaintiff did not meet listing 12.05B(1), the error is harmless because the ALJ clearly found plaintiff failed to meet the criteria for 12.05B(2) (deficits in adaptive functioning) and substantial evidence supports her finding.

Plaintiff also asserts the ALJ committed reversible legal error due to her failure to "acknowledge, address, or weigh" the evidence that plaintiff "intellectually functions on a 3rd to 4th grade level" and as assessed by plaintiff's IEP team shortly before his graduation from high school. Pl.'s Mem. 4 (citing R. 437, 466–67), 9. The ALJ references the same IEP team assessment in her opinion on multiple occasions. R. 16. She notes plaintiff graduated from high school under an IEP, that he could spell, read, write, and perform basic calculations with difficulty, that he can understand step-by-step directions, and can usually understand a task and continue it to completion. *Id.* While the ALJ did not specifically state that plaintiff was performing at a 3rd to 4th grade level, she did acknowledge and address the IEP team assessment. She factored the assessment into her findings regarding plaintiff's ability to understand, remember, or apply

information as well as his ability to concentrate, persist, or maintain pace. *Id.*

> The ALJ's reference to the IQ scores and the IEP team assessment was sufficient.
>
> While the Commissioner's decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based," 42 U.S.C. § 405(b)(1), "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."

*Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005)).  Further, when an ALJ states that she has considered the entire record, she will be taken at her word absent evidence to the contrary. *Id.*

Here, the ALJ referenced generally both of the pieces of evidence plaintiff criticizes her for failing to address.  The ALJ found plaintiff had "listing level IQ scores" without specifying the scores to which she was referring, and relied on the IEP team assessment, though not in the manner plaintiff wished.  Remanding the case to require the ALJ to reweigh this evidence would be pointless as substantial evidence supports the finding that plaintiff does not have deficits in adaptive functioning necessary to meet listing 12.05B(2).  Accordingly, plaintiff's motion to remand this case to the ALJ to apply the correct legal standard and weigh certain evidence should be **DENIED**.

## VI.    **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No.17) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 19) be **GRANTED**.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 15, 2022

39